547 S.E.2d 299 (2001)
248 Ga. App. 570
In the Interest of A.T.H. et al., children.
No. A00A2090.
Court of Appeals of Georgia.
March 13, 2001.
*300 Kristopher Shepherd, Lawrenceville, for appellant.
Thurbert E. Baker, Atty. Gen., Dennis R. Dunn, Deputy Atty. Gen., William C. Joy, Senior Asst. Atty. Gen., Shalen S. Nelson, Asst. Atty. Gen., for appellee.
RUFFIN, Judge.
Following S.S.'s conviction and life sentence for felony murder and armed robbery, the Athens Clarke County Department of Family & Children Services (DFCS) petitioned to terminate her parental rights to her three children, D.L.S. (age eight), A.T.H. (age seven), and J.D.E. (age six). Following a hearing, the trial court terminated S.S.'s parental rights with respect to A.T.H. and J.D.E., but not with respect to D.L.S.[1] S.S. appeals, challenging the sufficiency of the evidence and contending that the court erred in admitting certain documents. For reasons discussed below, we affirm.
1. In order to terminate parental rights, the trial court must follow a two-step process:

*301 First, there must be a finding of parental misconduct or inability, which requires clear and convincing evidence that: (1) the child is deprived; (2) the lack of proper parental care or control is the cause of the deprivation; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. If these four factors exist, then the court must determine whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home.[2]
On appeal, we view the evidence in the light most favorable to support the trial court's ruling and determine whether a rational trier of fact could have found by clear and convincing evidence that the parent's rights should have been terminated.[3]
In its order, the trial court noted that the children were originally adjudicated deprived on July 16, 1992. Except for a brief period in 1994, the children have been in foster care since the July 1992 order. S.S. has never provided financial support to the children while in foster care.
The July 1992 order set forth a number of goals that the mother had to comply with for reunification: (1) she had to submit to a psychological evaluation; (2) she had to obtain suitable housing for herself and her children; (3) she had to obtain employment; (4) she had to visit with the children; and (5) she could not violate the laws of Georgia or any other jurisdiction. These goals were incorporated into case plans developed by DFCS, and S.S.'s compliance with the goals was monitored by a citizens review panel that met every six months. In May 1996, S.S. was convicted of felony murder and armed robbery and was sentenced to two life sentences. She will not be eligible for parole until 2006, at the earliest.[4]
The court noted that even before her conviction and imprisonment, S.S. had failed to achieve the goals set forth in the reunification plans. The court found that S.S.'s felony conviction and sentence had a "demonstrable negative effect on the quality of the parent-child relationship" and that S.S. had "rendered herself physically, emotionally, mentally, and financially unavailable to these children and unable to assist in their rearing." The court stated that the children suffer emotionally because of their experience with S.S. and her imprisonment, and it concluded that "there is only a slight possibility that [S.S.] will be available to them in the year 2006, when she will be eligible to be considered for parole."
With respect to J.D.E., who lives in foster care with his paternal grandmother, the court noted that S.S. had not seen him since 1995 and that he
has formed no parental bond with the mother. During times of visits with his mother at [DFCS] early in his sojourn in foster care, the child would be upset by being around the mother. This child seldom talks about his mother but does say that he does not like her. He does not refer to her as "Mother" but refers to her [by her first name.]
The court also noted that J.D.E. had to see a psychologist for treatment after briefly returning to S.S.'s custody in 1994.
The court further found that except for a short period of time in 1994, A.T.H. has been in his aunt's custody since he was 17 months old.[5] The court stated that a strong parental bond has developed between A.T.H. and the aunt, whom he refers to as "Mother," and that the aunt desires to adopt him.
On appeal, S.S. does not deny that the children are deprived or that termination *302 is in their best interests. Instead, she contends there was insufficient evidence that the deprivation was likely to continue or would result in serious harm to the children. We disagree.
"Although imprisonment alone does not always compel a termination of parental rights, it will support such a ruling when adequate aggravating circumstances are shown to exist."[6] Such aggravating circumstances may be found, for example, where a parent "has not visited regularly with the children or established a parental bond, has failed to contact DFCS or refrain from criminal activity as required by the case plan, and has no present prospects for employment, income, or a stable home."[7] In addition, the length of a parent's incarceration, and thus the length of time the child must stay in foster care before any reunification is possible, is a factor that may be considered in determining whether termination is appropriate.[8]
In this case, there are several aggravating factors supporting termination. First, S.S.'s convictions of felony murder and armed robbery were violations of a reunification goal established by the court. Second, S.S. had approximately four years before her imprisonment in which to develop a parental bond with her children, but failed to do so. Indeed, although she was offered DFCS' rehabilitation services, S.S. failed to attend several of the citizens review panel meetings held every six months. On numerous occasions from 1993 to 1995, S.S. also failed to show up for scheduled visitations with J.D.E. Such failure to appear for scheduled visitations has often been cited as a factor supporting termination, since it demonstrates a lack of parental commitment and thus a likelihood that the deprivation will continue.[9] The record further shows that S.S. never established a parental bond with her children in the first place, that her current incarceration prevents her from forming one now, and that the children have developed such bonds with their foster parents.
The length of S.S.'s detention is another factor supporting termination, particularly considering the absence of any present parental bond with her two children. S.S. is currently serving two life sentences and will not be eligible for parole until 2006, at the earliest. By that time, J.D.E. and A.T.H. will be 14 and 15 years old, respectively, and each will have spent nearly his entire life in foster care. The trial court was authorized to consider the detrimental effects of such a prolonged stay in foster care, and the consequential decrease in the likelihood of adoption, as factors supporting termination.[10]
Although S.S. claims that she has made progress while in prison, by attending a parenting class, by trying to write or call her children, and by pursuing cosmetology training, "[w]hat weight to give recent improvements is a question for the trier of fact."[11] In considering a parent's claims of recent improvement, "the trial court, not the appellate court, determines whether a parent's conduct warrants hope of rehabilitation."[12] Regardless of her current good intentions, S.S. does not now have a parental bond with her children and has no chance of establishing a parental relationship for several years, at which time J.D.E. and A.T.H. will be near the age of majority. Under these circumstances, the juvenile court had ample grounds to conclude that the children's deprivation was likely to continue and to cause them serious harm.[13]
*303 2. During the termination hearing, DFCS offered into evidence certain records of the citizens review panel meetings held over the years. S.S. objected on hearsay grounds, arguing that the documents "contain conclusions and opinions of persons who are not before the Court." The trial court overruled the objection and admitted the documents "for whatever weight and credit I may give them." On appeal, S.S. contends that the trial court erred in admitting the documents over her hearsay objection. This contention is without merit, since OCGA § 15-11-56(c)[14] provides that
[i]n dispositional hearings under subsection (b) of this Code section and in all proceedings involving custody of a child, all information helpful in determining the questions presented, including oral and written reports, may be received by the court and relied upon to the extent of its probative value even though not otherwise competent in the hearing on the petition.[15]
Thus, the trial court did not err in allowing the documents to be introduced into evidence for whatever they were worth, which is exactly the purpose for which it stated it was admitting them.
To the extent S.S. suggests the trial court erred in relying on hearsay contained within the documents, such suggestion goes beyond the scope of her enumeration, which relates to the admissibility of the records as a whole. Moreover, S.S. makes no real argument to support such a suggestion, but simply implies that the trial court somehow relied on the reports in concluding that she had failed to meet her case plan goals. S.S. does not specify what statements within the documents the trial court allegedly relied upon or how such statements constituted hearsay lacking in probative value. It is not the function of this Court to cull the record in search of error on behalf of a party,[16] and it is even less so when the purported error is not supported by argument and goes beyond the scope of the enumeration. Furthermore, we note that S.S.'s noncompliance with her case plan goals is shown by competent evidence other than the objected-to citizens review panel reports. For example, her convictions for felony murder and armed robbery violated the court-ordered requirement that she not violate the law. In addition, the children's DFCS caseworker testified without objection that S.S. failed to complete required counseling sessions. This caseworker also testified from DFCS records about S.S.'s frequent failure to attend scheduled visitations, and after a belated hearsay objection by S.S.'s attorney, the trial court indicated that the testimony was admissible under the business records exception. S.S. herself testified that she could not comply with the case plans between 1993 and 1995 because she had two jobs and no transportation. Even apart from any hearsay in the panel reports, therefore, sufficient evidence demonstrated S.S.'s noncompliance with the reunification plan goals.[17]
Judgment affirmed.
ANDREWS, P.J., and ELLINGTON, J., concur.
NOTES
[1] The court noted that D.L.S. "suffers from emotional and mental health handicaps and maladies which have not been delineated to the Court by treating and evaluating experts." It noted that D.L.S. had "a strong emotional attachment to his mother" and that there was no evidence regarding how termination would affect the child. Accordingly, although it considered the mother unfit, the court could not find that termination would be in D.L.S.'s best interest based upon "no more than a lay person[']s bias respecting the impact that such termination may have on a child whose mental and emotional health are significantly impaired and unstable."
[2] (Footnote omitted.) In the Interest of V.M.T., 243 Ga.App. 732, 735-736(3), 534 S.E.2d 452 (2000).
[3] See In the Interest of S.H.P., 243 Ga.App. 720, 721, 534 S.E.2d 161 (2000).
[4] Although the trial court's order states that S.S. will be eligible for parole in 2006, S.S. testified that her tentative parole date is actually in November 2008.
[5] Testimony from the termination hearing indicates that the individual caring for A.T.H. is actually his great-aunt.
[6] (Punctuation omitted.) In the Interest of S.K.L., 199 Ga.App. 731, 733(1), 405 S.E.2d 903 (1991).
[7] In the Interest of R.L.H., 188 Ga.App. 596, 597, 373 S.E.2d 666 (1988).
[8] See In the Interest of R.M., 232 Ga.App. 727, 728-729, 503 S.E.2d 635 (1998).
[9] See, e.g., In the Interest of J.L.T., 241 Ga.App. 464, 470-471, 524 S.E.2d 740 (1999).
[10] See In re G.M. N., 183 Ga.App. 458, 461(1), 359 S.E.2d 217 (1987); In the Interest of R. M., supra at 728-729, 503 S.E.2d 635.
[11] In the Interest of L.S.D., 243 Ga.App. 626, 628, 534 S.E.2d 109 (2000).
[12] (Punctuation omitted.) Id.
[13] See id. (noting that mother "would not be able to care for the children [during their minority], as her probation forbade her from having unsupervised contact with them").
[14] This section was formerly OCGA § 15-11-33, but was redesignated by Ga. L.2000, p. 20, § 1.
[15] See also In the Interest of M.L.P., 236 Ga.App. 504, 510-511(2), 512 S.E.2d 652 (1999). Although this statute may not authorize a court to consider hearsay in making factual findings regarding the threshold issue of deprivation, see In the Interest of J.C., 242 Ga. 737, 740-741, 251 S.E.2d 299 (1978); In the Interest of D.S., 212 Ga.App. 203, 204, 441 S.E.2d 412 (1994), overruled in part on other grounds, In the Interest of J.P., 267 Ga. 492, 480 S.E.2d 8 (1997), it certainly authorizes a court to receive written reports in termination hearings and to consider such reports to the extent of their probative value. See Powell v. Dept. of Human Resources, 147 Ga.App. 251, 253-254(4), 248 S.E.2d 533 (1978).
[16] See Enchanted Valley RV Resort v. Weese, 241 Ga.App. 415, 422(3), 526 S.E.2d 124 (1999).
[17] See In the Interest of M.L. P., supra at 511(2), 512 S.E.2d 652.